**PARKER v. GORDON.**

No. 4431.

United States Court of Appeals
First Circuit.

Dec. 22, 1949.

Allan Roy Kingston, Boston, Mass. (Hubert W. Coffin, Christopher J. Muldoon, Jr., and Hale, Sanderson, Byrnes & Morton, Boston, Mass., with him on brief) for appellant.

Willis A. Downs, Boston, Mass. (John J. O'Neill, Boston, Mass, with him on brief) for appellee.

Before MAGRUDER, Chief Judge, WOODBURY, Circuit Judge, and CLIFFORD, District Judge.

MAGRUDER, Chief Judge.

Charles Gordon filed in the court below a complaint in tort against Stanley W. Parker for loss of consortium. The amended complaint, which was in two counts, is set forth in the footnote.[1] Judgment was

---

"COUNT ONE.

1. "I. The Plaintiff, Charles Gordon, is a resident of Scottdale, Westmoreland County, Pennsylvania, in the District of Pennsylvania. The Defendant, Stanley W. Parker, is a resident of Winthrop, Suffolk County, Massachusetts, in the District of Massachusetts. The matter in controversy exceeds exclusive of interest and costs, the sum of three thousand dollars.

"II. The Defendant, contriving and wrongfully intending to injure the Plaintiff and to deprive him of the comfort,

given for the plaintiff on a jury verdict, and defendant appeals.

 Federal jurisdiction was invoked on the ground of diversity of citizenship, plaintiff being a citizen of Pennsylvania and defendant of Massachusetts.[2] Defendant moved for summary judgment on the basis of a statute of Pennsylvania abolishing "all civil causes of action for alienation of affections of husband or wife". 48 P.S.Pa. § 170. In conjunction with this motion it was stipulated "that the alleged acts upon which the plaintiff is bringing this action are alleged to have been committed in * * * Massachusetts". Judge Wyzanski denied defendant's motion for summary judgment, in an

interesting opinion reported in D.C. 83 F. Supp. 40. Thereafter the case was tried and submitted to the jury on the theory that the law of Massachusetts was applicable, and on the present appeal no error is urged in this respect. We therefore do not consider any possible questions of the conflict of laws.

Plaintiff Gordon was born and raised in Pennsylvania. After their marriage in 1940, he and his wife Naomi made their home in Pittsburgh, where he had a job. In March, 1941, Gordon was called to active duty as a reserve officer in the U.S. Army, and sent to a post in Boston Harbor. During the ensuing months they lived together in an apartment in Winthrop, Mas-

---

society, aid and assistance of Naomi Bishop Gordon, the wife of the Plaintiff, and to alienate her affection for him,

"(a). unlawfully and unjustly gained the affection of his said wife and persuaded, procured and enticed his said wife to leave the home of the Plaintiff and to continue absent from the same, by means of which persuasion and enticement she did continue absent for long periods of time;

"(b). on divers times and before the commencement of this action, wrongfully and wickedly debauched and carnally knew the Plaintiff's said wife, she being then the wife of the Plaintiff by means whereof her affection for the Plaintiff was wholly alienated and destroyed.

"III. As a result, the Plaintiff lost the company, aid and assistance of his said wife, and her affection for him was wholly alienated and destroyed.

"Wherefore, the Plaintiff demands judgment in the sum of Fifty Thousand Dollars ($50,000.00) and costs.

"COUNT TWO.

"I. The Plaintiff, Charles Gordon, is a resident of Scottdale, Westmoreland County, Pennsylvania, in the District of Pennsylvania. The Defendant, Stanley W. Parker, is a resident of Winthrop, Suffolk County, Massachusetts, in the District of Massachusetts. The matter in controversy exceeds exclusive of interest and costs, the sum of three thousand dollars.

"II. The defendant entered into adulterous relations with Naomi Bishop Gordon, the wife of the plaintiff, and continued to have such adulterous relations with her for a long period of time during the years of 1943 and 1944, both within

and without this Commonwealth, that by reason of the defendant having such adulterous relations with the wife of the plaintiff, he was thereby guilty of criminal conversation.

"III. By reason of the defendant having adulterous relations with the plaintiff's wife, the plaintiff was deprived of the love, company, assistance, affection, and conjugal fellowship of his said wife, and the plaintiff was deprived of the consortium of his said wife.

"Wherefore, the plaintiff demands judgment in the sum of Fifty Thousand Dollars ($50,000.00) and costs."

2. The amended complaint merely alleges that plaintiff is a "resident" of Pennsylvania and defendant a "resident" of Massachusetts. This has been held to be insufficient as an allegation of diversity of citizenship. Keene Lumber Co. v. Leventhal, 1 Cir., 1948, 165 F.2d 815, 818, footnote 1, and cases cited. But as we pointed out in that case, "where a defective jurisdictional allegation is eked out by finding the missing jurisdictional facts in some other part of the record, it may be appropriate for the appellate court, without requiring the formality of a motion, to consider the complaint as having been amended to conform to the facts appearing of record and thus to sustain the jurisdiction of the lower court." In the present case the inference is clear from the testimony of the plaintiff and of the defendant that they were citizens, respectively, of Pennsylvania and Massachusetts. In this state of the record we take it that the district court had jurisdiction of the complaint and that the present appeal should be disposed of by us on the merits.

:sachusetts. Gordon left for overseas in March, 1942, and Mrs. Gordon went to Scottdale, Pennsylvania, to live with her husband's family. In December, 1943, Mrs. Gordon came back to Massachusetts to visit her former neighbors in Winthrop, and on this occasion she met the defendant Parker. It did not take long for that chance meeting to ripen into a warm friendship. Mrs. Gordon returned to Pennsylvania in February, 1944, but was back again in Winthrop for another visit in March, and saw Parker again. In May, 1944, Mrs. Gordon came up for a third visit, but this time she stayed at a hotel in Boston rather than with friends. Her last visit to Boston without her husband was over the July 4th weekend of 1944.

Starting shortly after their first meeting, and during all of Mrs. Gordon's above-mentioned visits to Boston, she and Parker had numerous dates together, swimming, bowling, dancing, dining out, or dining in Parker's apartment sometimes with no third person present. There were "going-away" kisses, "welcome-back" kisses, and "just regular" kisses. Parker rather grudgingly admitted to other occasional familiarities indicative of a less than discreet relationship between him and Mrs. Gordon. Both denied on the witness stand that they had ever had adulterous intercourse. Gordon, however, testified that during a meeting he had with Parker, after divorce proceedings against Mrs. Gordon had been instituted, Parker admitted that he had had "improper sexual relations" with Mrs. Gordon, but added: "The conversation goes between you and I only, and if you think you can prove it, go ahead. As far as I am concerned, you can see my attorney". This conversation was denied by Parker.

In the intervals between Mrs. Gordon's visits to Boston, Parker kept up his contact with her by long-distance telephone, and by correspondence. Mrs. Gordon thought she had destroyed Parker's letters, but Mr. Gordon's "meddlesome aunt", to use a phrase of the district judge, fished out from the incinerator and pieced together the torn fragments of three of these letters, which eventually were turned over to Gor-don, and were introduced as exhibits at the trial below. The letters look silly in print, and would hardly be included among the classics of amatory writing. They are, however, sprinkled with terms of endearment and erotic allusions which betoken a relationship not casual and circumspect, but intimate indeed. From certain expressions in the letters, together with other evidence in the case, a jury would be warranted in inferring that Parker's intention was to break up the marital relationship between Mrs. Gordon and her husband, and to appropriate her for himself. We refer, for instance, to expressions such as "the speed of our pickup on loving"; "Come on quit haunting me and join me for good!"; "Were you today to join me for life we'd just sail right along on a breeze having fun, having fights, having love,. having many friends. Gosh, do we click!"; "Gee this week how I wished I could spoil you again—but this time for life." Parker's explanation that he was merely trying to keep up Mrs. Gordon's morale during the period of her enforced separation from her husband might not unreasonably be discredited.

Gordon testified that he noticed a change in the tone of his wife's letters to him overseas, coinciding with the inception of her acquaintanceship with Parker. Mrs. Gordon met her husband in August, 1944, in Washington, D.C., upon his return from India. Gordon testified: "There was a complete metamorphosis in her reactions. My desires for her, of course, had been unchanged. But I say she was neurotic. The matter of sexual relations were entirely out of the question with her"; and further he said that there were no sexual relations between them from the time Gordon returned from abroad. Shortly after his arrival in Washington, he and his wife proceeded to Fort Harrison, Indiana, where they occupied an apartment together while he took a six-weeks training course. Upon their return to Scottdale, Pa., Gordon saw for the first time the three letters from Parker above referred to. Gordon consulted a lawyer with reference to a divorce. He decided to try for a reconciliation, and

he and Mrs. Gordon embarked on what he described as a "second honeymoon". En route to Canada, they stopped for a few days in Boston, renewing acquaintances, and incidentally the two of them dined with Parker at the latter's apartment. After a short stay in Canada, during which it was evident, according to Gordon, that the reconciliation was not working out, they returned to Boston, picked up their car, and drove to Scottdale, Pa. Mrs. Gordon remained at the home of her husband's parents at Scottdale, Pa., while he took a three-months course in Military Government at Princeton, New Jersey. In early spring of 1945 Gordon instituted a divorce suit against his wife, and the divorce was eventually granted.

According to Mrs. Gordon's testimony she had been faithful to her husband throughout, had not ceased to love him, and had had no desire to separate from him; she attributed the estrangement which developed after his return to this country in August, 1944, to his changed attitude, rather than to hers. She testified that "all the time" during the period after his return, up to the filing of the divorce suit, they had lived together and had had relations "as husband and wife"; that at or about the time of the filing of the divorce suit her husband had peremptorily ordered her to remove her things from the home of Mr. Gordon's parents; and that after that she moved out and did not live with her husband thereafter.

When the evidence was all in, defendant filed a motion for a directed verdict on both counts. The motion was denied. In this there was no error, if for no other reason than that there was certainly sufficient evidence to warrant a finding of criminal conversation, and this, admittedly, would have made out a cause of action under the Massachusetts law.

Defendant then presented certain requests for rulings. So far as appears, the district judge did not expressly rule on these requests one by one. But with one possible exception, to which we shall refer later, the requests for rulings were in substance, we think, embodied in the ensuing charge to the jury. When the judge had finished with his main charge, he asked: "Is there any point that I have omitted?". Counsel for defendant stated that he had "nothing to suggest." The jury retired to consider its verdict, but subsequently returned for further enlightenment from the judge, at which time the court gave the jury certain additional instructions which we shall refer to at a later point.

The jury brought in a verdict for the plaintiff on Count 1, in the sum of $5,000, but found for the defendant on Count 2. On the same day judgment was entered for the plaintiff on Count 1, and for the Defendant on Count 2. A memorandum by the district judge, explaining his reasons for not setting aside the verdict on Count 1, is reported in D.C., 83 F.Supp. 43.

Thereafter, defendant moved to set aside the verdict for the plaintiff on Count 1, and the judgment entered thereon, and for the entry of judgment for the defendant notwithstanding the verdict. This motion was denied, for the reasons stated in a memorandum reported in D.C., 83 F.Supp. 45.

The legal wrong here in question, as recognized by the Massachusetts courts, is sometimes inaccurately described as the tort of "alienation of affections". Dow v. Bulfinch, 1906, 192 Mass. 281, 283, 78 N.E. 416. However, the Supreme Judicial Court of Massachusetts has repeatedly stated that alienation of affections alone is not a substantive cause of action, but merely aggravates the damages where the wife is debauched or enticed away. Evans v. O'Connor, 1899, 174 Mass. 287, 291, 54 N.E. 557, 75 Am.St.Rep. 316; Neville v. Gile, 1899, 174 Mass. 305, 306, 54 N.E. 841; Gahagan v. Church, 1921, 239 Mass. 558, 559, 132 N.E. 357; Longe v. Saunders, 1923, 246 Mass. 159, 160, 140 N.E. 741; Sherry v. Moore, 1927, 258 Mass. 420, 423, 155 N.E. 441; McGrath v. Sullivan, 1939, 303 Mass. 327, 329, 21 N.E.2d 533. The gist of the action is a "loss of consortium", brought about by the unprivileged acts of the defendant—i.e., acts done "with malice or improper motives" (Gahagan v. Church, supra, 239 Mass. at page 559, 132 N.E. at

page 358)—as distinguished, for example, from the mere giving of honest advice having in view the welfare of both spouses (Tasker v. Stanley, 1891, 153 Mass. 148, 26 N.E. 417, 10 L.R.A. 468. The interest of the husband expressed by the term "consortium" is defined in Bigaouette v. Paulet, 1883, 134 Mass. 123, 124, 45 Am.Rep. 307, as "the right to the conjugal fellowship of the wife, to her company, cooperation and aid in every conjugal relation." If criminal conversation between the defendant and the wife is proved, nothing further need be shown to make out a cause of action, for this is an obvious trespass upon one of the basic rights of consortium, an invasion of the husband's "exclusive right to marital intercourse with his wife, and to beget his own children"; and so it is said that "loss of the consortium is presumed" from the fact of criminal conversation. Bigaouette v. Paulet, supra, 134 Mass. at page 125.

But under the Massachusetts cases it is clear that the tort of loss of consortium may be established by proof of acts other than criminal conversation. Thus in Gahagan v. Church, supra, the defendant, by a campaign of love-making evidently designed to break up the marital relationship, enticed the wife to leave her husband's home and thus to withhold performance of her conjugal duties. The court held that a verdict for the plaintiff was warranted, though there was no allegation or proof of adulterous intercourse. To the same effect see Bradstreet v. Wallace, 1926, 254 Mass. 509, 150 N.E. 405; Sherry v. Moore, supra, 1927, 258 Mass. 420, 155 N.E. 441; Georgacopoulos v. Katralis, 1945, 318 Mass. 34, 37, 60 N.E.2d 10. If Houghton v. Rice, 1899, 174 Mass. 366, 54 N.E. 843, 47 L.R.A. 310, 75 Am.St.Rep. 351, may be read as holding to the contrary, it is out of step with controlling Massachusetts precedents.

Though we have found no square decision in any Massachusetts case on the point, we believe the Massachusetts courts would hold that an action for wrongful deprivation of consortium might in some circumstances be sustained even though the wife was not enticed and induced to abandon her husband's home, and though adulterous relations were not proved. Thus if the defendant's course of love-making, with the purpose of disrupting the marital relationship, has the effect of inducing a married woman to refuse sexual relations with her husband, there has been a tortious deprivation of an essential right of the consortium, even though the wife, in mockery of the conjugal relation, continues to live under the same roof with her husband until he turns her out and obtains a divorce. Such seems to be the law in other jurisdictions. See Prosser on Torts, p. 917; American Law Institute, Restatement of Torts § 684, Comment b. There is at least a negative implication to the same effect in McCracken v. Cohen, 1947, 322 Mass. 12, 75 N.E.2d 501. In that case the court upheld a directed verdict for the defendant, saying, 322 Mass. page 13, 75 N.E.2d page 501: "There was evidence that would have required the jury to find that the associations of the defendant and the plaintiff's wife were known to the plaintiff during the entire period * * *, but that notwithstanding he continued to live with her, *occupying the same bed with her and having sexual relations with her* even down to the time of the trial of the present case in the court below. [Italics added.] This being so, and since the jury would not have been warranted in finding that the plaintiff's wife had been debauched by the defendant, there could be no recovery for loss of consortium." Again, in Longe v. Saunders, supra, the action failed because, as the court said, 246 Mass. page 160, 140 N.E. page 742, "there could be no recovery so long as the two lived together *as husband and wife* in their [own] home and no adultery was committed with the wife." [Italics added.] See also Nolin v. Pearson, 1906, 191 Mass. 283, 287, 77 N.E. 890, 4 L.R.A., N.S., 643, 114 Am.St.Rep. 605, 6 Ann.Cas. 658.

With this statement of the Massachusetts law, we turn to the complaint in the case at bar.[3] Count 2 charges criminal

---

3. Quoted in footnote 1, supra.

conversation, which, without more, would make out a cause of action, deprivation of consortium being presumed in that case, as we have seen. Paragraph II(b) of Count 1 also alleges criminal conversation, so in that respect the two counts overlap; that is, a finding for plaintiff on both counts would be warranted if criminal conversation were established. But paragraph II(a) and paragraph III of Count 1 were apparently intended by the pleader to allege a cause of action for breach of consortium even in the absence of adulterous relations; and we think the allegations of the complaint were sufficient in that respect under the authority of Webber v. Benbow, 1912 211 Mass. 366, 97 N.E. 758. At any rate, that is how the district judge construed Count 1 of the complaint, and that is the theory on which he submitted the case to the jury.

On appeal, the defendant makes a strained argument that the gist of the cause of action set forth in Count 1 is criminal conversation, with alienation of affections alleged merely as aggravation of damages, so that the two counts are for all legal purposes precisely identical. From this premise, he argues that the verdict on Count 1 was necessarily inconsistent with the verdict for the defendant on Count 2; and hence that the judgment for the plaintiff on Count 1 cannot stand.

■ But as the case was submitted to the jury there was no inconsistency on the face of the verdicts. It is too late now for the defendant to raise this point as to the proper interpretation of the complaint. Defendant did not request the district judge to charge the jury that they could not find for the plaintiff on either count unless they were satisfied that there had been adulterous relations between the defendant and the plaintiff's wife. Indeed, some of the defendant's requests for rulings apparently assumed that the plaintiff might recover by proof of something other than criminal conversation. For instance, request No. 6 read: "Before the plaintiff may recover he must prove not only alienation of his wife's affection from him, but also show that his wife was debauched *or* enticed

away." [Italics added.] After the district judge charged the jury on these alternative theories of liability, and counsel were afforded an opportunity to comment on the charge, counsel for the defendant stated that he had nothing to suggest, and indicated no objection to the charge as given. See Rule 51, Federal Rules of Civil Procedure, 28 U.S.C.A.

■ We have said that perhaps there was one of the defendant's requests for rulings which was not in substance embodied by the court in its charge to the jury. That was request No. 5: "If the evidence shows that the plaintiff and his wife continued to live together and further shows that no adultery was committed with the wife the plaintiff is not entitled to recover", which request was submitted to the judge as having been founded on Longe v. Saunders, 246 Mass. 159, 140 N.E. 741. In the main charge, the judge told the jury that on Count 1, for the plaintiff to prevail, they "must find either adultery or that the defendant caused the wife to leave the husband." But after the jury had deliberated for a while, they came back to the court with the question "whether Mrs. Gordon's several visits to the Boston area constituted leaving home?". The judge then pointed out that this question need not bother the jury if they had found adultery, but that if they had come to the conclusion that there was no adultery, then the question would have to be dealt with. He proceeded to read to the jury the following quotation from Longe v. Saunders, which case the defendant had cited as the basis of its request No. 5: "The plaintiff could recover * * * only by proof that the defendant with malice or improper motives persuaded and enticed his wife to leave his home; there could be no recovery so long as [they] lived together as *husband and wife* in their home and no adultery was committed with the wife."

The judge thus gave emphasis to the phrase "as husband and wife" which was significantly omitted in the language of request No. 5. He then explained to the jury that if Mrs. Gordon came to Boston "with the intention of not thereafter having mar-

ital relations with her husband, she was enticed away"; and that they might so find if they believed Mr. Gordon's story, but not if they believed Mrs. Gordon's testimony. In other words, as the case was finally submitted to the jury, they were permitted to find for the plaintiff on Count 1 if they believed that Parker's acts, having the purpose of disrupting the marital relationship, had had the effect of inducing Mrs. Gordon to refuse sexual relations with her husband, even though adultery was not proved, and even though Mrs. Gordon continued to live under the same roof with her husband after his return from India until he ordered her to get out. As above indicated, we think that the charge to this effect was not in error under the Massachusetts law. Furthermore, after the judge had made this further explanation in response to the question brought back by the jury, he turned to counsel and asked: "Is there anything I have omitted in the opinion of counsel?", and counsel for the defendant responded: "No, your Honor." Thus on being afforded a second opportunity to comment on the charge, counsel voiced no objection to the charge as given.

In his motion for judgment notwithstanding the verdict, defendant advanced the point that the plaintiff had "failed to prove any loss of consortium due to the defendant's indiscreet actions", the evidence having shown beyond doubt "that the plaintiff's wife continued to live with the plaintiff until the plaintiff left her." To this, the district judge gave two answers, (1) that there is "no legal difference between enticing a wife to leave her husband's home and enticing her to leave her husband's bed", and that the evidence warranted a finding that Mrs. Gordon had been enticed to leave her husband's bed, and (2) that the jury might have based its verdict for the plaintiff on Count 1 upon a finding of adulterous relations, and though such a finding would have been inconsistent with the finding on Count 2, a jury is permitted to be inconsistent in its verdicts, citing Dunn v. United States, 1932, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356, 80 A.L.R. 161, and United States v. Dotterweich, 1943,

320 U.S. 277, 279, 64 S.Ct. 134, 88 L.Ed. 48.

But if the judge was in error in submitting Count 1 to the jury with the instruction that they might find for the plaintiff thereon not only if there had been criminal conversation, but also, alternatively, if the defendant by his unprivileged acts had enticed Mrs. Gordon from her husband's bed, then such error could not be cured by the pure assumption or speculation that the jury might not have based its verdict on Count 1 upon a finding permitted by the erroneous instruction, but rather, upon a finding of criminal conversation. Wilmington Star Mining Co. v. Fulton, 1907, 205 U.S. 60, 78, 27 S.Ct. 412, 51 L.Ed. 708; Erie R. Co. v. Gallagher, 2 Cir., 1918, 255 F. 814, 817; Christian v. Boston and Maine R. R., 2 Cir., 1940, 109 F.2d 103, 105; Roth v. Swanson, 8 Cir., 1944, 145 F.2d 262, 269; Detroit, T. & I. R. Co. v. Banning, 6 Cir., 1949, 173 F.2d 752, 755. See also Terminiello v. City of Chicago, 1949, 337 U.S. 1, 5, 69 S.Ct. 894. This is especially true, in view of the verdict on Count 2, which on its face would suggest the probability that the verdict on Count 1 was based upon the alternative ground submitted to the jury. While it is possible that the jury, though believing that there was criminal conversation, chose not to cast this imputation upon the parties, and preferred to bring in a plaintiff's verdict on the more inclusive Count 1, it cannot, in order to save the verdict on Count 1, be presumed that the jury thus disregarded the court's instructions.

■ However, the verdict on Count 1 should be sustained on the ground that the court was not in error in submitting the count to the jury in the alternative, that the verdict thereon was warranted by the evidence, and was not on its face inconsistent with the verdict on Count 2. In this view, we have no occasion to consider how far the doctrine of Dunn v. United States, supra, as to really inconsistent verdicts, is law to-day, and how far it applies also to civil cases.

Nor are we required to examine into the correctness of other propositions of law

stated or suggested by the district judge in his two post-verdict memoranda, which obviously could not invalidate a verdict otherwise unassailable on appeal. The district judge might, under his broad discretion in such matters, have set aside the verdicts and granted a new trial. He chose not to do so, and in fact the defendant never moved for a new trial. The only motion which the defendant made after verdict was a motion for judgment in his favor notwithstanding the verdict. There was certainly no error in denying that.

The judgment of the District Court is affirmed.