Nathan GREENBERG

v.

PANAMA TRANSPORT COMPANY
and
Esso Tankers, Inc.
Civ. A. No. 59–617.

United States District Court
D. Massachusetts.

July 1, 1960.

Daniel J. Hourihan, Boston, Mass., for plaintiff.

Joseph F. Dolan, Boston, Mass., Walter X. Connor, of Kirlin, Campbell & Keating, New York City, for defendants.

WYZANSKI, District Judge.

1. This is a diversity action by Nathan Greenberg, a lawyer who is a citizen of Massachusetts, against a Panamanian and a New Jersey corporation for interference with advantageous contractual relations.

2. Greenberg is a member of, *inter alia*, the bars of the courts of the State of Maine, the Commonwealth of Massachusetts, and of this United States District Court.

3. Jose Vazquez is a Spanish citizen who on December 6, 1958 was employed as a seaman aboard the S. S. Esso Rochester, a ship of Panamanian registry, owned by a Panama corporation, Panama Transport Company, all the stock of which was owned by Esso Tankers, Inc., an American corporation.

4. Under his contract of employment, executed outside the United States, and presumably in Spain, Vazquez had, in the event of injury, a right to disability payments calculated according to a percentage of his wages, and also an award on account of any permanent partial disability. It does not appear that the Spanish contract expressly or impliedly precluded the seaman from seeking any judicial or administrative remedy available to him on account of any injury. So far as appears, the contract offered merely an optional and not an exclusive form of compensation for injury.

5. While working aboard ship in the Portland, Maine harbor, Vazquez was caught by the runner rope to the head of the winch. He sustained a tourniquet amputation of the tips of the third and fourth fingers of the left hand and of the tip of the fourth finger of the right hand, a fracture of the neck of the proximal phalanx of the left index finger, a fracture of the tip of the radial styloid, and a fracture of the wing of the left ilium. He was promptly admitted to the Mercy Hospital in Portland. Without a recital of all the medical history, it will for present purposes suffice to say that as a result of the accident Vazquez was out of employment for four months and incurred hospital and medical bills of about $400.

6. Torres, another seaman, informed Greenberg of Vazquez's injury and Vazquez's wish to have Greenberg as his counsel. Greenberg sent his associate, Malone, in Torres's company to see Vazquez in Portland. On December 9, 1958 Vazquez, voluntarily, without being subject to any improper inducement, and fully understanding the tenor of his action, executed a document retaining Greenberg to represent him "respecting any claim against the S. S. Esso Rochester, its owners and operators * * *. For such services, I agree to pay my said attorney a fee not to exceed services rendered. I agree to pay my said attorney a fee not to exceed one-third of

any amount collected by way of court verdict or settlement."

7. Upon the basis of the disclosed facts and the discoverable law, Greenberg believed that Vazquez had valid causes of action under the Jones Act and under the general maritime law both against his employer and the American corporation which owned all the stock of the employing corporation. This was certainly a reasonable view before that part of the February 24, 1959 decision in Romero v. International Terminal Operating Co., 358 U.S. 354, 381–385, 79 S.Ct. 468, 3 L. Ed.2d 368, which affirmed the dismissal against Compania Transatlantica. And even after the Romero case the claim may still be reasonable in view of the fact that an American corporation owned all the stock in the Panamanian corporation which employed Vazquez. Cf. Bartholomew v. Universe Tankships, Inc., 2 Cir., 263 F.2d 437.

8. After Vazquez had retained him, Greenberg went to Portland on December 16, 1958. While the client and attorney were conferring, Heidtmann, acting for both defendants, went to visit Vazquez. Having learned that Greenberg was Vazquez's attorney, Heidtmann at once informed Eggleston, the Assistant Chief of the Seafaring Personnel Section of Esso Tankers, Inc., who was in New York.

9. Leaving New York the next day, Eggleston, accompanied by a Spanish-speaking associate, Esparza, visited Vazquez in the hospital December 18. Eggleston told Vazquez what his contractual rights were and what Eggleston thought of U. S. lawyers and how they handled seamen's claims. These statements went far beyond a mere factual recital of Vazquez's legal rights and Vazquez's freedom to discontinue retaining Greenberg. They were deliberate misrepresentations of the role of American lawyers, of the services which they customarily render to injured seamen, and of the advantages which seamen derive from claims made in American courts. Eggleston's principal purpose was not to give disinterested, candid information to Vazquez, but, on the contrary, was deviously to promote defendants' interest by inducing Vazquez to settle his claim against defendants on the terms of a Spanish contract less favorable to Vazquez than would be the value of the claim presented to a United States Court.

10. In the middle of his conversation with Vazquez, Eggleston was called to the telephone. His New York associates then informed him that the present defendants had just then been served with process in a suit brought against them in the Southern District of New York by Vazquez represented by correspondents of Greenberg.

11. Vazquez did not respond at once to Eggleston's suggestion that he should dismiss Greenberg. But it is fairly inferable that Eggleston's arguments had a continuing effect on Vazquez.

12. Not satisfied with such pressure as he himself had been able to bring upon Vazquez to discharge Greenberg, Eggleston on December 28, 1958 and on January 28, 1959 wrote to a Spanish firm, Consulmar S. L. This firm was the intermediary through which Vazquez and other seamen procured employment on the S. S. Esso Rochester and other vessels in which Americans had direct or indirect interests. On behalf of defendants, Eggleston informed Consulmar that Vazquez had retained Greenberg, that defendants "have pointed out to him [Vazquez] that it is possible for him to discharge his attorney * * *. However, as yet we have had no definite commitment from the injured man that he intended to go along with the company and discharge his lawyer." The correspondence, as a whole, makes it clear that in their own interest, and by unjustifiably disparaging American lawyers, defendants sought to have Consulmar persuade Vazquez to discharge Greenberg.

13. Responding to defendants' requests, Consulmar on December 31, 1958 wrote to Vazquez that "it sometimes happens that disabled men in [the] U.S.A. are induced by local Agents who seek a share of the claim not caring for the future of the person involved and you are under a Spanish Contract, I would like

to advise you of the risk you could meet should you leave aside the Contract's conditions under which you were employed and which covers you largely in this accident."

14. Finally the efforts of defendants directly and through Consulmar were successful. February 13, 1959 Vazquez dismissed Greenberg. As Eggleston wrote to Consulmar on February 18, "Mr. Vazquez stated it was his earnest desire to continue sailing for Panama Transport Company and that he was willing to accept what is called for under the terms of the employment contract."

15. February 16, 1959 Vazquez left the United States for Spain. His flight to Spain was paid for by defendants.

16. It is fairly inferable that after dismissing Greenberg as his counsel and leaving the United States, Vazquez either discontinued his action in the Southern District of New York against defendants or manifested an intention never to prosecute it to completion.

17. From the evidence as a whole this Court concludes that defendants by misrepresenting the role which American lawyers can and often do perform for their clients in accident litigation, by falsely leading Vazquez to believe that his own best interests would be served by relying exclusively on his Spanish contract, and by depreciating, without any basis for so doing, the professional services which Greenberg was prepared to render Vazquez, knowingly and in bad faith caused Vazquez to dismiss his counsel Greenberg in February 1959.

18. As of the time in February 1959 when Greenberg was dismissed as counsel, Vazquez's claim was worth in Greenberg's opinion $25,000. In this valuation Greenberg took into account, among other considerations, defendants' potential liability for Vazquez's injury, the damages he sustained, the place the injury occurred, the American incorporation of defendant Esso Tankers Inc., the decision in Bartholomew v. Universal Tankships, Inc., 2 Cir., 263 F.2d 437, other cases before and after Romero v. International Operating Co., 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 was decided, and Greenberg's own experience in handling seamen's litigation. However, this Court considering these same factors, the extent to which Greenberg had by February 1959 been able to prepare the case for trial, the uncertainties of jury verdicts, and the doubtful points of law, finds that as of February 1959 Vazquez's claim was worth $15,000.

19. This Court finds that for the services performed by Greenberg up to the time that he was discharged a reasonable fee would be $500 plus expenses of $95. To be sure, for these amounts Vazquez himself is liable to Greenberg. But defendants have made it unlikely that Greenberg can ever collect that sum from Vazquez. Defendants have caused Vazquez to leave this country. Also defendants have induced Vazquez either to dismiss or not to prosecute the action which, if successful, would have produced a judgment on which Greenberg might have had directly or indirectly the benefit of an attorney's lien. If defendants had not caused Vazquez to discharge Greenberg, and if Greenberg had carried the case to the point of settlement, or of trial and judgment, Greenberg would have had an opportunity to earn an additional fee. The additional amount which Greenberg might have reasonably expected to earn and which defendants precluded him from earning was an additional $4,500. However, since this amount would have required an expenditure of additional effort and time by Greenberg, which he now need not expend but can devote to other clients, this Court regards $2,250 as a fair valuation of the future earnings of which Greenberg has been deprived. In short, this Court finds that Greenberg's damages from the loss of his retainer amount to $500 plus $95 plus $2,250 or a total of $2,845.

Having made the foregoing findings of fact this Court now turns to the questions of law.

Plaintiff has chosen to present this case as one falling within the diversity jurisdiction of this Court. There being

the necessary diversity of citizenship and amount in controversy, this Court is content to take jurisdiction on that basis. 28 U.S.C. § 1332(a). It is unnecessary to consider whether in view of Greenberg's claim that defendants interfered with a professional relationship between a proctor and officer of a United States admiralty court and his client additional bases of jurisdiction could have been invoked. Cf. 28 U.S.C. § 1333(1). See also 28 U.S.C. § 1331(a).

Despite the fact that this case is presented as one within the diversity jurisdiction, it does not automatically follow that, in considering the validity of Greenberg's retainer, this Court must turn to the state law of Massachusetts for guidance as to the appropriate conflict of laws rules or the appropriate substantive rules. O'Brien v. Western Union Tel. Co., 1 Cir., 113 F.2d 539. Cf. Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 176, 63 S.Ct. 172, 87 L.Ed. 165. The claims for which Vazquez retained Greenberg arose out of the general maritime law and out of an Act of Congress, the Jones Act. Such claims, while theoretically presentable in either a state court or a federal court, are usually presented in a federal court. And, in fact, presentation before the federal court in the Southern District of New York did occur in the case at bar.

■ To hold that the validity of a retainer to perform services in a federal court with respect to a federal cause of action should be determined by state law would seem highly artificial. Every policy consideration dictates that the federal courts should enunciate uniform national rules to determine the validity of contracts made by proctors in admiralty, who are officers of federal courts, to present claims to federal courts. That is, there should be "a uniform national rule of law, binding on state and federal courts alike, where the operative legal policies are federal in origin." Paul A. Freund, Federal-State Relations In The Opinions of Judge Magruder, 72 Harv.L. Rev. 1204, 1213.

■ Applying a national rule of law, this Court concludes that the contract under which Vazquez retained Greenberg was valid. The contract was an entirely normal arrangement. It did not in the technical sense provide for a contingent fee. And the terms of compensation fall within the zone of reasonableness.

■ Having determined that the retainer contract is governed by federal law, and that under such law the contract is valid, the Court must next consider what law governs a claim that defendants have tortiously interfered with the contract. It is usually assumed that in connection with the tort of interfering with advantgeous contract relations, as in connection with torts generally, the governing rule is supplied by the law of the place where the tort occurs. Hendler v. Cuneo Eastern Press, Inc., 2 Cir., 279 F. 2d 181. Restatement, Conflicts §§ 378, 384. But the grounds of logic, history, convenience, and policy which support this doctrine in many cases, particularly cases of physical injury, are not appropriately invoked in every type of case. Different torts may be governed by different principles of conflict of laws. Cf. Gordon v. Parker, D.C.D.Mass., 83 F. Supp. 40, affirmed sub nom. Parker v. Gordon, 1 Cir., 178 F.2d 888. See A. A. Ehrenzweig, Alienation of Affections In the Conflict of Laws, 45 Cornell Law Qu. 514, 515. And the conflict of laws rules governing even the particular tort of interference with advantageous contractual relations may depend upon what type of contract relationship is said to have been impeded.

■ Here we have a claim that when sued in a federal court defendants interfered with the contractual relationship between the then plaintiff who was suing them and his attorney, the present plaintiff. In determining the applicable law to decide this claim, it does not seem of the greatest importance where that interference occurred. Nor does it seem of decisive importance in what forum the claim of alleged interference is made. The controlling principles of substantive law should be enunciated on a national

basis applicable to anyone who is said to have interfered with a professional relation between an officer of a national court and his client. Cf. O'Brien v. Western Union Tel. Co., 1 Cir., 113 F.2d 539. See Freund, op. cit.

The federal courts being free to apply a national rather than a state standard to claims that defendants have interfered with relations between federal lawyers and their clients, the federal courts would probably mould the national standard with appropriate references to Restatement, Torts, §§ 766–774. Drawing upon those sections as well as the general case law this Court concludes that in the case at bar defendants, without a privilege so to do, have induced Vazquez not to continue his professional relations with Greenberg and are therefore liable to Greenberg for the damages thereby caused to Greenberg.

■ On the facts already found there can be no room for doubt that defendants deliberately induced Vazquez to discontinue his relations with Greenberg. Cf. Restatement, Torts, § 766. But it is suggested that defendants were merely trying to persuade Vazquez to abide by his obligations under a Spanish contract with his employer, defendant Panama Transport Co., and that, therefore, the inducement was privileged. The argument, premised upon Restatement, Torts § 773 and Hendler v. Cuneo Eastern Press Inc., 2 Cir., 279 F.2d 181, is that "The plaintiff's interest in freedom from interference with contract relations may be invaded with impunity by the defendant in protecting a contract right of his own." To that argument the short answer is that defendants had no contract "rights" of their own, and Vazquez had no "obligations". The Spanish contract between defendant Panama Transport Co. and Vazquez gave defendants no "rights". It imposed upon Vazquez no "obligations". It merely gave Vazquez a set of optional payments for his injury. That Spanish contract did not purport to preclude Vazquez from suing in United States courts the Panamanian company, much less Esso Tankers, Inc. And if it

had so purported, such preclusive provision would have been invalid. 46 U.S. C.A. § 688. See Bay State Dredging & Contracting Co. v. Porter, 1 Cir., 153 F. 2d 827, 832.

To say the same thing in another way, defendants were not trying to get Vazquez to abide by his obligation, they were trying to induce him to choose to deal with them directly instead of dealing with his lawyer. And in connection with these efforts defendants resorted to misrepresentations which were close to calumny. Their unwarranted and malicious interference with the professional relation between Vazquez and Greenberg makes them liable to Greenberg for the damages of $2,845 which Greenberg suffered. Keene Lumber Co. v. Leventhal, 1 Cir., 165 F.2d 815, 61 Harv.L.Rev. 897–898.

Judgment for plaintiff for $2,845.